Filed 1/17/25  Nolan v. City of Los Angeles CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROBERT NOLAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Respondent,<br><br>RAO BOPPANA,<br><br>    Real Party in Interest and Respondent. | B334235<br><br>(Los Angeles County<br> Super. Ct. No.<br> 22STCP02053) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.
        Venable, Ellia M. Thompson, and Sarah M. Hoffman for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Valerie L. Flores, Chief Deputy City Attorney, John W. Heath, Chief Assistant City Attorney, and K. Lucy Atwood, Deputy City Attorney, for Defendant and Respondent.

Craig A. Sherman for Real Party in Interest and Respondent.

———————————————

## INTRODUCTION

In 2019 Robert Nolan applied for a conditional use permit from the City of Los Angeles Department of City Planning to maintain a fence he built in 2006 that exceeded the height limit under applicable zoning ordinances.[1] The zoning administrator, who was the initial decisionmaker, issued Nolan a permit subject to 11 terms and conditions. Rao Boppana, Nolan's next-door neighbor, appealed from the zoning administrator's decision to the West Los Angeles Area Planning Commission, which overturned the zoning administrator's decision.

Nolan filed a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5,[2] which the superior

———————————————

[1] "A conditional use permit authorizes a land use that, under a zoning ordinance, is allowed only when certain conditions are met." (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1097, fn. 2.)

[2] Code of Civil Procedure section 1094.5 is "the state's administrative mandamus provision which structures the procedure for judicial review of adjudicatory decisions rendered by administrative agencies." (*Topanga Assn. for a Scenic*

court denied. Nolan appeals from the judgment, arguing that substantial evidence did not support the Commission's findings and that the Commission's findings did not support its ultimate decision to deny his application for a permit. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Nolan Builds a Fence, the Bureau of Engineering Grants Him a Permit After-the-fact, and the Superior Court Issues a Writ of Mandate Requiring the Bureau To Revoke the Permit*

Nolan owns a house in a residential neighborhood on a coastal bluff in Playa del Rey. The front of the house (the southwestern edge of the property) faces Berger Avenue, a public street. Berger Avenue becomes Veragua Drive at a slight turn four houses down from Nolan's house. The northwestern edge of Nolan's property faces Veragua Walk, a 10-foot-wide strip of city property. To the southeast of Nolan's house is a vacant lot Nolan purchased in 2003.

In 2006 Nolan built a fence that consisted of two wooden sliding gates, seven pillars, a wooden pedestrian entry gate, and a wrought iron fence, together with 535 square feet of concrete, ranging in height up to six feet, along approximately 100 feet of Berger Avenue and in the public right-of-way. Along Veragua Walk, Nolan built a concrete block wall ranging in height from one foot to seven feet, a chain-link fence ranging in height from three feet to five feet, a two-foot tall planter box, and two sets of

_____

*Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515; see *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115.)

concrete steps.  Nolan also installed landscaping along the street and the walk.

In December 2015 Nolan applied for and obtained a revocable permit, known as an "R-permit," from the Bureau of Engineering, an office within the City of Los Angeles Department of Public Works.  The R-permit allowed Nolan to maintain the improvements he constructed in the public right-of-way almost a decade earlier.  (*Boppana v. City of L.A.* (Mar. 19, 2019, B283454) [nonpub. opn.] (*Boppana I*).)

Rao Boppana and his wife, who live on the northwest side of Nolan's house, filed a petition for writ of mandate to require the Bureau to revoke the 2015 R-permit.  The Boppanas argued the Bureau issued the permit without reviewing Nolan's application to ensure it complied with the City's Building Code, Zoning Plan, and Specific Plan.  The superior court denied the petition, the Boppanas appealed, and we reversed.  We directed the superior court to issue a writ of mandate compelling the Bureau to revoke the permit it had issued Nolan because, we explained, the Bureau did not determine whether Nolan's improvements complied with applicable municipal land use laws.  (*Boppana I*, *supra*, B283454.)

On remand the superior court ordered the Bureau to revoke Nolan's R-permit.  In October 2019 the Bureau revoked the permit.

B.    *Nolan Obtains a Conditional Use Permit To Maintain His Fence*

Shortly after the Bureau revoked the R-permit, Nolan applied for a permit from the Department of City Planning to "allow the continued use and maintenance of fences and hedges up to 8'-0" in height . . . in lieu of [the] 3-1/2 feet allowed by code," "within the Required Front yard, and extending into the Public Right Of Way."  Nolan submitted plans with the specifications of his front yard fence: "6-1/2-foot in height stone/masonry pilasters topped by decorative lamps reaching a height of 7 feet, 10-1/2 inches"; "6.1-foot in height wrought iron fencing spans"; "two steel framed vehicle gates with wooden slats having heights of 6 feet, 5 inches" and "one steel-framed pedestrian gate with wooden slats having heights of 6 feet, 5 inches"; and "6 to 8-foot in height hedges."  The entire fence (with hedges) encroached into the Berger Avenue public right-of-way approximately five feet eight inches; behind the fence, a semicircular driveway also encroached into the Berger Avenue public right-of-way.  We refer to this structure as Nolan's fence or Nolan's existing fence.

Rao Boppana submitted two letters to the City Planning Department, objecting to Nolan's application.  Boppana claimed that Nolan's application contained "false information"; that Nolan's fence obstructed his "sightline" when Boppana drove out of his driveway, endangering other drivers, cyclists, and pedestrians; and that, given Nolan's house was next to a public park and trail, the fence blocked "the viewshed" of the park visitors.  Nolan contested Boppana's claims and asserted that there were several properties in "the immediate area" with overheight fences and walls in the front yard and public right-of-way (specifically, an eight-foot fence constructed of "solid

5

stainless steel" at 7841 Veragua Drive) and that neighbors supported his front yard structures and greenery. Nolan also stated that he built his fence and gates because, after the local homeowners' association built a small park and walking trail adjacent to his property, hikers and dog-walkers crossed through his front yard on their way to the park, throwing litter and leaving dog feces on his property.

Jonathan Hershey, an associate zoning administrator, set a public hearing to consider, under Los Angeles Municipal Code section 12.24, subdivision (X)(7),[3] Nolan's application for "the continued use and maintenance of a fence, hedges, pedestrian gate, columns, and two vehicular driveway gates with a maximum height of eight feet . . . as prohibited by" section 12.21, subdivision (C)(1)(g). At the hearing Nolan, Boppana, and their attorneys and representatives provided statements.

Hershey also visited Nolan's neighborhood and found that, except for the property at 7841 Veragua Drive, there were "no other authorizing entitlements for front yard fences" that exceeded the maximum height of three and one-half feet. Hershey stated "the proposed (existing)" fence was "an anomaly within the immediate neighborhood" and was "dissimilar" to other fences along Berger Avenue and Veragua Drive. Although Hershey saw a few properties with fence and landscaping improvements taller than three and one-half to four feet, he found none of them was "as visually inconsistent with its immediate environment" as Nolan's fence. Hershey also pointed out that the Office of Zoning Administration had not approved any overheight front yard fences "within a 500-foot radius" of

---

[3] Undesignated section references are to the Los Angeles Municipal Code.

Nolan's property and that the only such request (for a nine-foot fence) was denied. As for 7841 Veragua Drive, Hershey stated that property was 900 feet from Nolan's property, had "documented security concerns," and was not visible from Nolan's property. Hershey said that, based on his observations of the houses in Nolan's neighborhood, he was able to discern the following "tenuous pattern of development": "Solid and opaque fences are acceptable at or behind the front property line and open fence designs are more acceptable when those fences encroach into the public right-of-way."

Hershey approved Nolan's request for a conditional use permit under section 12.24 for a front yard fence, "as conditioned." The authorization letter (titled "Zoning Administrator's Determination—Fence Height") included 11 terms and conditions.[4] We refer to the fence Hershey approved with the conditions specified in his authorization letter as the "conditional fence" (because Nolan never satisfied the conditions and the fence never came into existence).

---

[4] Hershey authorized Nolan to maintain his fence and gates "within the required front yard setback" (i.e., not in the right-of-way) with the following conditions relevant to this appeal: "The fence and gates shall consist of an open wrought iron design, with the fence having a maximum height of 6.1 feet and the gates having a maximum height of 6 feet 5 inches," the pilasters with decorative lamps may not exceed "a maximum height of 7 feet 10-1/2 inches," any vegetation "which produces a hedge-like effect" in between the pilasters shall not exceed "the height of 3-1/2 feet," and any landscaping between the fence and curb face shall not exceed "a maximum height of 3-1/2 feet." Nolan had to comply with the 11 terms and conditions before he could get the conditional use permit.

7

Hershey made a series of findings. First, a "6-foot in height fence proposed as encroaching into the public right-of-way, with an open wrought-iron design to minimize the visibility of the fence, and a prohibition on over-height landscaping, would be more representative of the existing pattern of development."[5] Such a fence "will enhance the built environment in the surrounding neighborhood and will perform a function or provide a service that is beneficial to the community." Second, the issue of impaired visibility from the Boppanas' driveway was "largely a result of the fence's encroachment into the Berger Avenue public right-of-way."[6] With the conditions Hershey (came up with and) imposed "to ensure its compatibility with similar improvements in the surrounding community," Nolan's fence "will be compatible with and will not adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety." Third, because Nolan's fence "has been conditioned [i.e., by Hershey] to better reflect the pattern of development within the immediate community to preserve a

---

[5] This statement contradicts the permit condition that Nolan maintain the fence in the front yard setback. As to be discussed, Hersey clarified his findings at a subsequent administrative hearing.

[6] Hershey explained that his authority only extended "up to the limit of the front property line, and no farther," and that the Department of Public Works was the entity with authority to permit Nolan to build his fence within the public right-of-way. Hershey stated that he did "not disagree" the fence, if maintained within the Berger Avenue public right-of-way, reduced visibility of on-coming traffic, but clarified that he did not determine whether the reduced visibility "results in a hazardous condition or not."

more consistent feel to the development of the residential neighborhood, the project substantially conformed to the purpose, intent, and provisions the General Plan, the applicable community plan, and any specific plan." Fourth, Nolan's property did not have "significant biological resources, including wildlife corridors," and Nolan's fence, as conditioned by Hershey, would not diminish any "views, vistas, or viewsheds across the property." And the "proposed fence" would "dissuade" trespassing and "better secure" the property.

C. *The Area Planning Commission Overturns Hershey's Decision*

Boppana filed an appeal with the West Los Angeles Area Planning Commission, asking the Commission to overturn Hershey's decision to approve, with conditions, Nolan's permit application. Boppana argued that Hershey's factual findings did not support his conclusions, that Hershey erred in concluding the Department of Public Works had the authority to permit a fence built in the public right-of-way, that the conditions Hershey imposed were "ambiguous," and that Hershey's findings were inconsistent with the findings required by section 12.24, subdivisions (E) and (X)(7)(c). Nolan submitted a letter to the Commission that essentially repeated the assertions he made in the letter he submitted to Hershey in support of his permit application. Nolan also said his neighborhood "is located in a quiet residential area with little traffic" and attached photographs, which he said depicted the shortened greenery on either side of his front yard fence.

At the hearing before the Commission, Hershey presented his findings. Hershey stated Nolan's fence was built "without

City Planning approval" and has been within the public right-of-way for approximately 15 years. Hershey made clear that his authority extended "to the property line and no further" and that he did not have authority to permit construction within a public right-of-way. Given this limitation, Hershey explained, he could consider only "a similar kind of construction that would theoretically exist at the property line" and whether such a construction would be compatible with the surrounding community. Hershey stated that, after conducting a site visit through the "immediate vicinity" of Nolan's property, he determined Nolan's fence within the public right-of-way was "significantly different" from other fences "within the immediate area." Therefore, Hershey stated, he conceived of a fence with "a particular height and construction and placement" that would be compatible with the "surrounding area" and then approved that plan. Hershey stated that his findings expressed "the anomalous nature of the existing fence" and that maintaining the fence within the public right-of-way "would not be consistent with the surrounding area." However, Hershey concluded, if Nolan complied with the conditions Hershey had specified, the fence would be "reconstructed at the front property line."

Boppana stated that Nolan's fence adversely affected his property because he could not see approaching traffic from his driveway, a situation he described as "an accident waiting to happen." Nolan said he had never seen an accident on the street. Counsel for Nolan stated his client had trimmed the hedges down to three and one-half feet in height. Counsel for Boppana argued that Nolan will not "pull [his fence] back" to the property line and that the Commission should deny Nolan's application "as is."

10

One of the Commissioners, Lisa Morocco, asked Hershey if he had any police reports of activities in the park that endangered Nolan's security, and Hershey said that he asked Nolan to provide copies of any "official reports," but that Nolan did not provide any. The commissioner asked if Nolan provided any photographs or documentation about "any kind of persistent occurrences [of] trespassing or loitering" on his property. Hershey stated: "No, there was just [Nolan's] anecdotal testimony that these were occurring." Hershey confirmed he believed the "overheight fence at the property line" would be "appropriate," with the conditions he imposed that the plants do not exceed 42 inches in height and that Nolan construct the gate with wrought iron to allow more "see through." Commissioner Morocco said it was "crystal" clear to her that Hershey's opinion applied only to the requirements for a fence at the property line (i.e., not in the public right-of-way). Commissioner Esther Margulies confirmed with Hershey that he approved the fence with the specified conditions "within the required . . . front yard setback" and commented that Hershey's conditions for approval required "demolition of the existing fence and driveway gate and moving it . . . within the setback." Commissioner Morocco concluded the proposed "overheight fence is not . . . justified in the setback, and it's certainly not justified in the right-of-way," because in the commissioner's view, there was "no evidence" the fence would be "compatible with the neighborhood," there was "no substantial evidence" of "safety issues" such as "trespassing or dogs," and "the visual capacity" from the Boppanas' driveway would be "diminished because of the height" of the fence.

Commissioner Morocco recommended the Commission grant Boppana's appeal because the fence proposed by Hershey

11

did not meet two of the requirements for an "overheight request." First, Commissioner Morocco stated, the fence was an "anomaly" in the neighborhood and was "not consistent" with other gates and fences, there was no "substantial evidence" Nolan "suffered any safety issues or any trespassing," and even if there were people "cutting the corner" onto Nolan's property, a 42-inch fence "would solve the problem." Second, Commissioner Morocco stated, she disagreed with Hershey's finding the project's size, height, operation, and other significant features would be compatible with, and would not adversely affect or degrade, adjoining properties. The commissioner found that the fence was not consistent "in terms of height" and "in terms of material" with other fences and gates "in the community" and that the fence "may impede some visual capacities" of the Boppanas. Commissioner Margulies added that many of the existing fences and gates were "within the legal limit of 42 inches," but that, if the proposed fence "becomes more of a pattern in the neighborhood, there may be impacts on views of the coast and the coastal mountains."

After Commissioner Morocco moved to grant the appeal, the deputy city attorney asked the commissioner if, by making the motion, she was finding Hershey erred in finding the project compatible. Commissioner Morocco said she was, and added, "I feel so very strongly that this is just not appropriate, this height at the property line and absolutely certainly not appropriate in the public right-of-way." The Commission passed the motion to grant Boppana's appeal.

The Commission subsequently issued a document titled "Letter of Determination" granting Boppana's appeal and overturning Hershey's decision to issue Nolan a conditional use

12

permit.  The Commission stated its findings and cited the evidence that supported each finding.  First, the Commission found the "project will not enhance the built environment in the surrounding neighborhood and will not perform a function or provide a service that is essential or beneficial to the community, city, or region."  The Commission stated the "proposed fence was an anomaly within the community" and "was not consistent with other front yard fences and gates in the community."  The Commission also stated "there was no evidence to substantiate" Nolan's argument his fence was compatible with the community or evidence Nolan "suffered any security issues or trespassing . . . a 42-inch in height fence would not be able to resolve."  The Commission concluded the "requested height" (of almost eight feet) served only Nolan's needs and did not provide any benefit to the community.  Second, the Commission found the "project's location, size, height, operations, and other significant features will not be compatible with and will adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety."  The Commission restated the evidence of how the proposed fence was inconsistent with other neighboring fences in terms of height and materials and concluded Hershey erred in finding the conditional fence would be compatible with the surrounding neighborhood.  The Commission also stated that the proposed fence could impair the "visual capacity" of the Boppanas from their driveway and that, if approved, the fence could set a precedent "that would erode and diminish views of the coast and distant mountains."  Third, the Commission agreed with Hershey the proposed fence would not impact scenic views from surrounding residences or public streets, in conformance with the General Plan, the

13

applicable community plan, and any specific plan.  Finally, the Commission stated that, in reaching its decision, it had considered the environmental effects and appropriateness of the materials, design, and location, including any detrimental effects on the view enjoyed by occupants of adjoining properties and security to the subject property.

D.    *The Superior Court Denies Nolan's Petition for Writ of Administrative Mandate*

Nolan filed a petition for writ of administrative mandate under Code of Civil Procedure sections 1085 and 1094.5 and a complaint for declaratory and injunctive relief.[7]  Nolan alleged substantial evidence did not support the Commission's findings. Nolan asked the superior court to issue a writ of mandate directing the Commission to "vacate and set aside" its decision to grant Boppana's appeal.  Nolan also sought a "judicial declaration as to the legality" of the Commission's actions and injunctive relief to prevent the Commission "from taking any kind of code enforcement action for the existing fence, gates, and landscaping within the public right-of-way."

The trial court concluded "quite a bit of substantial evidence" supported the Commission's decision, denied Nolan's petition, and entered judgment in favor of the Commission and Boppana.  Nolan timely appealed.

---

[7]    As the superior court observed, in a ruling Nolan does not challenge, Nolan did not state a cause of action for mandamus under Code of Civil Procedure section 1085.

14

## DISCUSSION

A.      *Applicable Law and Standard of Review*

Under Code of Civil Procedure section 1094.5, "the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 (*Topanga*); see *Santa Monica Beach v. Superior Court* (1999) 19 Cal.4th 952, 972; *Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005, 1010-1011.) Section 1094.5, subdivision (b), states the court's inquiry "should extend" to whether "'there was any prejudicial abuse of discretion,'" which the provision defines "to include instances in which the administrative order or decision 'is not supported by the findings, *or* the findings are not supported by the evidence.'" (*Topanga*, at p. 515; see *Sky Posters Inc. v. Department of Transportation* (2022) 78 Cal.App.5th 644, 659; *City of Hesperia v. Lake Arrowhead Community Services Dist.* (2019) 37 Cal.App.5th 734, 748.) Under section 1094.5, subdivision (c), "'abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.'" (*Topanga*, at p. 515; see *City of Hesperia*, at p. 748; *Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418.) "[I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga*, at p. 515; see *Hilltop Group, Inc. v. County of San Diego* (2024) 99 Cal.App.5th 890, 918; *Save Livermore*

15

*Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1130.)

"'On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights . . . we review the agency's findings, not the superior court's decision, for substantial evidence.'" (*Sky Posters Inc. v. Department of Transportation*, *supra*, 78 Cal.App.5th at p. 660, fn. omitted; see *City of Hesperia v. Lake Arrowhead Community Services Dist.*, *supra*, 37 Cal.App.5th at p. 748 ["we review the matter without reference to the trial court's actions," internal quotation marks omitted].) Land use decisions typically do not involve fundamental vested rights. (See *Topanga*, *supra*, 11 Cal.3d at p. 510, fn. 1 [administrative agency's decision to issue a zoning variance did not involve "any fundamental vested right"].)[8]

"'Under the substantial evidence test, the agency's findings are presumed to be supported by the administrative record and the appellant challenging them has the burden to show they are not.' [Citation.] '[T]he reviewing court [must] consider all relevant evidence in the administrative record and view that evidence in the light most favorable to the agency's findings, drawing all inferences in support of those findings. [Citation.] The reviewing court does not substitute its own findings and inferences for that of the agency. [Citation.] "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence."'" (*Holguin Family Ventures, LLC v.*

---

[8] Nolan acknowledges his "underlying administrative mandamus case does not involve a fundamental vested right."

16

*County of Ventura* (2024) 104 Cal.App.5th 157, 168; see *Sky Posters Inc. v. Department of Transportation*, *supra*, 78 Cal.App.5th at p. 659; *Save Laurel Way v. City of Redwood*, *supra*, 14 Cal.App.5th at p. 1011.)

"In reviewing whether substantial evidence supports the [administrative agency's] . . . decision, we do not reweigh the evidence. [Citation.] Rather, we 'determine whether there is any evidence (or any reasonable inferences which can be deduced from the evidence), whether contradicted or uncontradicted, which, when viewed in the light most favorable to an administrative order or decision or a court's judgment, will support the administrative or judicial findings of fact.'" (*Young v. City of Coronado*, *supra*, 10 Cal.App.5th at p. 427; see *Holguin Family Ventures, LLC v. County of Ventura*, *supra*, 104 Cal.App.5th at p. 168 ["""[i]t is for the [administrative agency] to weigh the preponderance of conflicting evidence"""].) Our review "is not designed to rectify an imprudent decision by an administrative agency. Administrative mandamus is not to be used to control the discretion of an administrative body, but only to ensure that it was not abused." (*Young*, at p. 420.)

B.  *Relevant Los Angeles Municipal Code Provisions*
Section 12.21, subdivision (C)(1)(g), and section 12.22, subdivision (C)(20)(f), restrict front yard fences of properties in Nolan's neighborhood to a height of 42 inches. Section 12.24, subdivision (X)(7)(a), provides that a zoning administrator may, upon application, "permit fences, walls or gates not to exceed eight feet in height, including light fixtures, in the required front yard." Section 12.24, subdivision (E), states: "A decision-maker shall not grant a conditional use . . . without finding: [¶] 1. that

17

the project will enhance the built environment in the surrounding neighborhood or will perform a function or provide a service that is essential or beneficial to the community, city, or region; [¶] 2. that the project's location, size, height, operations, and other significant features will be compatible with and will not adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety; and [¶] 3. that the project substantially conforms with the purpose, intent and provisions of the General Plan, the applicable community plan, and any applicable specific plan." (See *York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1182.) In addition to making these three findings, the zoning administrator "shall consider the environmental effects and appropriateness of materials, design and location of any proposed fence or wall, including any detrimental effects on the view which may be enjoyed by the occupants of adjoining properties, and security to the subject property which the fence or wall would provide." (§ 12.24, subd. (X)(7)(c).) A property owner like Nolan applying for a land use adjustment has the burden of demonstrating the City Planning Department should grant him a conditional use permit. (See *York*, at p. 1191; *Hauser v. Ventura County Bd. of Supervisors* (2018) 20 Cal.App.5th 572, 576.)

Under section 12.24, subdivisions (E) and (X)(7)(c), the zoning administrator had to make each of these findings before he could approve Nolan's application for a conditional use permit. Thus, we will uphold the Commission's decision if substantial evidence supported one of the Commission's conclusions Hershey erred in approving a conditional permit. (See *Kutzke v. City of San Diego* (2017) 11 Cal.App.5th 1034, 1041 ["We must uphold the [administrative agency's] decision if any one of [its] findings

18

is supported by substantial evidence."]; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 336-337 ["As long as the [administrative agency] made a finding that any one of the necessary elements enumerated in the ordinances was lacking, and this finding was itself supported by substantial evidence, [its] denial of appellant's application must be upheld."].)

C.     *Substantial Evidence Supported the Commission's Findings*

1.     *The Project Will Not Enhance the Built Environment in the Neighborhood or Perform an Essential or Beneficial Function*

Substantial evidence supported the Commission's finding that Nolan's fence, as modified or reimagined by Hershey, did not meet the first criterion for a conditional use permit and that, instead of enhancing the built environment, the fence would be inconsistent with other front yard fences and gates in the community.  Though Hershey observed in the "immediate area" other overheight (non-permitted) fences that were approximately six feet tall, the impacts of those fences were "diminished through their setback from the property line" or their "open design, which minimized their appearance."  Even if Nolan agreed to move his fence out of the public right-of-way,[9] the pilasters and decorative

9     Nothing in the record suggests Nolan had any intention of complying with Hershey's condition to move his fence back to the property line or to replace the three wooden gates with more "see-through" gates.  In a February 1, 2022 letter to the Commission Nolan stated he was beginning to gradually trim his hedges, but he did not say he was taking any steps to move his fence out of the public right-of-way or to install iron gates.

lamps would still be almost eight feet high, and the vehicle and pedestrian gates would still be six feet five inches high, well above the height of permitted and non-permitted fences in the neighborhood. And there was no evidence Nolan's fence benefitted the community. In fact, the Boppanas, several neighbors, and others in the community stated Nolan's fence created a blind spot that endangered public safety.

2. *The Project Will Not Be Compatible with, or Will Adversely Affect or Further Degrade, Adjacent Properties or the Neighborhood*

Substantial evidence supported the Commission's finding Nolan's fence, again as modified by Hershey, did not satisfy the second criterion for a conditional use permit. The maximum height of the fence and adjoining structures, seven feet 10 and one-half inches, was inconsistent with the code-compliant height of other fences in the vicinity. Except for the house at 7841 Veragua Drive (which we will discuss), there were no other permitted front yard fences taller than 42 inches. In fact, the Office of Zoning Administration did not approve any overheight front yard fences within a 500-foot radius of Nolan's house and denied a request for a nine-foot fence. Even the non-permitted fences were not higher than six feet.

In addition, Nolan's conditional fence would have obstructed the Boppanas' sightlines for entering and exiting their driveway. Rao Boppana stated that, because of the height and expanse of Nolan's existing fence, he could not see approaching traffic from his driveway and that other drivers, cyclists, and pedestrians on Berger Avenue could not see a car leaving Nolan's driveway. Nine members of the community stated Nolan's fence

20

obstructed sightlines, left the public with no path to walk other than in the roadway, and blocked the ability of on-coming traffic to see cars leaving Nolan's driveway. (See *Kutzke v. City of San Diego*, *supra*, 11 Cal.App.5th at p. 1041 ["'opinions and objections of neighbors can provide substantial evidence to support rejection of a proposed development'"].) Although five members of the community said they supported Nolan's fence, the Commission did not err in weighing the conflicting evidence in making its decision. (See *Holguin Family Ventures, LLC v. County of Ventura*, *supra*, 104 Cal.App.5th at p. 168; see also *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 953 ["the court's job ""is not to weigh conflicting evidence and determine who has the better argument"""].) Because the height of the conditional fence would have been essentially the same as the existing fence, the Commission reasonably concluded the conditional fence would pose a safety hazard, especially with the increased traffic from visitors to the park and public trail. (See *Holguin Family Ventures*, at p. 168 [reviewing court draws all inferences from the evidence in support of the agency's findings]; *Young v. City of Coronado*, *supra*, 10 Cal.App.5th at p. 427 [same].)[10]

---

[10] We do not discuss the third finding under section 12.24, subdivision (E). The Commission agreed with Hershey the project substantially conformed with the purpose, intent, and provisions of the General Plan, the applicable community plan, and any applicable specific plan.

21

3. *The Environmental Effects, Appropriateness of Materials, Effects on Adjoining Properties, and Security Issues Regarding Nolan's Property Weighed Against Issuing a Permit*

Substantial evidence supported the Commission's finding Hershey erred in considering the factors listed in section 12.24, subdivision (X)(7)(c). As discussed, Nolan's conditional fence would create a safety hazard by obstructing the roadway view of the Boppanas, other neighbors, and community members. Conversely, Nolan not only failed to substantiate his claim hikers and dog walkers freely crossed his front yard, he also failed to submit evidence a 42-inch fence could not adequately keep out potential trespassers. Nolan cites his application to the Planning Department, where he explained "'[f]ences and gates to 8 feet in height discourage climbing and breaching, and therefore provide . . . much needed privacy and security.'" Nothing in the record, however, substantiated this assertion (for example, evidence Nolan had previously installed a 42-inch high fence or other barrier that failed to deter trespassers). The property at 7841 Veragua Drive with the overheight opaque fence had documented security concerns.

D. *The Commission's Findings Supported Its Decision*

As discussed, to overturn Hershey's approval of the conditional use permit, the Commission needed to find only that Hershey erred in making one of the four findings required under section 12.24, subdivisions (E) and (X)(7)(c). (See *Levi Family Partnership, L.P. v. City of Los Angeles* (2015) 241 Cal.App.4th 123, 130 ["one adequate finding is sufficient to support the [administrative agency's] decision"]; *Desmond v. County of Contra*

*Costa, supra*, 21 Cal.App.4th at pp. 336-337 ["Because we are reviewing a *denial* of a requested land use permit, it is not necessary to determine that *each* finding by the [administrative agency] was supported by substantial evidence."].) The Commission's findings Hershey erred in making three of the four findings supported its decision to overturn Hershey's approval. (See *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1214 ["Logically, where the grant of the permit requires satisfaction of each and every statutory requisite, the *denial* of the same permit may be sustained where a single statutory requirement is not met."].)

Nolan asserts that, "[r]ather than make detailed findings, explaining the analysis leading to its conclusion, the Planning Commission decided on the outcome it wanted, then searched for findings to justify that result" and that the Commission's "terse 'boilerplate rejections' of [Hershey's] findings do not bridge the analytic gap between the evidence and the final decision and are legally inadequate." The record does not support Nolan's assertion. The commissioners analyzed the features of Nolan's fence (which exceeded the height limit by two to four and one-half feet, consisted of opaque materials, and spanned the entire front property line), found these features were inconsistent with the neighborhood, and determined that, even with Hershey's conditions, the fence would still be out of place in the neighborhood and detract from the built environment. The commissioners questioned Hershey about his observations, confirmed that one of Hershey's conditions was to move the fence from the public right-of-way to the property line, expressed concern Hershey had approved a fence with a maximum height of eight feet "when it looks like other project[s] in the area only get

23

to six feet," discussed how the Commission's decision could affect any decision by the Bureau, and examined the feasibility of imposing additional conditions. Commissioner Morocco, after reviewing the evidence, concluded Nolan could not satisfy the first two criteria of the applicable city ordinance. Contrary to Nolan's characterization of the hearing, the Commission discussed the evidence, made findings supported by that evidence, and reached a reasonable decision.

The Commission's findings, both at the hearing and in its written decision, adequately traced the "analytic route" the Commission took "from evidence to action." (*Topanga*, *supra*, 11 Cal.3d at p. 515.) As discussed, Commissioner Morocco cited the evidence that showed Hershey erred in making his findings under the first and second criteria of section 12.24, subdivisions (E) and (X)(7)(c). The Letter of Determination discussed all four of the Commission's findings under section 12.24, subdivisions (E) and (X)(7)(c). In sum, the Commission reviewed the evidence in the administrative record and found that, even with Hershey's conditions, the project would leave an oversized fence structure out of character with the neighborhood. The Commission's oral and written statements adequately stated the reasons for its decision. (Cf. *West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1522 [city council did not comply with the requirements of *Topanga* where the council's decision simply "set forth the details of the project and state[d] that the permit has been granted, with no indication of the reason for the ultimate decision"].)

Nor did the Commission err in using language Nolan characterizes as "boilerplate." Because the ordinance requires

24

the Commission to make specific findings, the Commission was entirely justified in making findings that tracked the language of the ordinance. (See *Young v. City of Coronado*, *supra*, 10 Cal.App.5th at p. 424 [where the ordinance requires the administrative agency to make specific findings of fact, "a resolution that incorporates findings that reflect the ordinance's language could sufficiently inform the parties of the analytical path adopted by the administrative agency in reaching its ultimate conclusion"]; *Levi Family Partnership, L.P. v. City of Los Angeles*, *supra*, 241 Cal.App.4th at p. 134 [same].) In addition, for each finding required under section 12.24, subdivisions (E) and (X)(7)(c), the Commission cited evidence specific to Nolan's case. The Commission's findings were neither terse nor boilerplate.

Nolan also argues the Commission, in granting Boppana's appeal "due to Nolan's fence's location on the public right-of-way," "overstepped its authority and arrogated the Bureau's role for itself." Nolan misstates the record. The commissioners, and in particular Commissioner Morocco, were (crystal, in her words) clear on the subject of Boppana's appeal: Hershey's approval of a conditional use permit for Nolan's fence at the property line. While some of the commissioners expressed concern about the extent to which Nolan's existing fence encroached into the public right-of-way, the Commission limited its decision to the conditional fence Nolan would maintain at the property line (if he complied with Hershey's 11 conditions). As Commissioner Morocco stated, the evidence did not justify Nolan's conditional fence "in the setback." The Letter of Determination similarly made clear the Commission was overturning Hershey's determination to allow Nolan to maintain his fence "within the

required front yard setback."  In particular, for its second finding under section 12.24, subdivision (E), the Commission stated "the proposed fence was not appropriate at the front property line or within the public right-of-way."

In addition, as discussed, the Commission's principal concern was the height of Nolan's fence structure, which Hershey did not modify.  Therefore, though the Commission at times referred to Nolan's existing fence instead of the conditional fence, perhaps suggesting the members were referring to the existing fence, the result of the Commission's decision would have been the same:  The eight-foot-high structure, regardless of where Nolan put it, was incompatible with the neighborhood.  And to the extent there is any doubt the Commission considered Nolan's existing fence rather than Hershey's conditional fence, we resolve such doubt in the Commission's favor.  (See *Levi Family Partnership, L.P. v. City of Los Angeles*, *supra*, 241 Cal.App.4th at p. 129, fn. 4 ["the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination"].)

Focusing on the Commission's use of the adjective "immediate" instead of "surrounding" to describe the location of other fences in the neighborhood, Nolan argues the Commission applied "the wrong standard in rendering its decision."  Nolan asserts the Commission did not acknowledge the evidence that another property owner, whose property was 900 feet from Nolan's property, obtained a permit to build an overheight fence in the public right-of-way.  The Commission did not apply the wrong standard, Nolan has not shown there is any meaningful difference between the two adjectives, and Hershey's findings, which Nolan argues the Commission should have upheld, used

26

the two adjectives interchangeably. For the second finding required under section 12.24, subdivision (E), the Commission found that, because Nolan's conditional fence was not consistent in terms of height or materials with other fences in the "immediate vicinity" (among other reasons), the project's location, size, height, operations, and other significant features would not be compatible with, and would adversely affect or further degrade, adjacent properties, the "surrounding neighborhood," or the public health, welfare, and safety. Thus, the Commission correctly tracked the language of the ordinance ("surrounding neighborhood") to describe its ultimate finding.

In citing the evidence on which it relied, the Commission used the term "immediate" to describe the neighborhood in which the comparator fences were located because that was the modifier Hershey used in his findings: "The applicant's proposed (existing) fence is an anomaly within the immediate neighborhood and is dissimilar to other fences maintained along Berger Avenue and Veragua Drive." Hershey cited evidence that, within a 500-foot radius, there were no permitted overheight front yard fences, that his office had denied a request for a permit to build a nine-foot fence, and that the only overheight fence his office had approved was 900 feet away at 7841 Veragua Drive. Hershey used the words "surrounding" and "immediate" interchangeably. For example, when observing other overheight fence permit requests in Nolan's neighborhood, under the subheading "Surrounding Properties," Hershey listed both the property with the denied permit request (within a 500-foot radius) and 7841 Veragua Drive (within a 1,000-foot radius); the Commission merely adopted Hershey's usage. Because the record supported the reasonable inference the Commission used

27

"surrounding" and "immediate" interchangeably, the Commission's finding Nolan's proposed project would not be compatible with properties in the immediate neighborhood encompassed 7841 Veragua Drive. Moreover, that the Commission did not discuss that particular fence does not mean that it failed to consider it. (See *Young v. City of Coronado, supra*, 10 Cal.App.5th at p. 432 ["The absence of discussion of the evidence on the record does not mean that the [administrative agency] failed to consider the evidence."].)[11] The Commission also cited evidence Nolan's conditional fence could "impair the visual capacity" of the Boppanas from their driveway, to conclude the evidence did not support Hershey's finding on the second criterion of section 12.24, subdivision (E).

---

[11] In his opening brief Nolan points to five properties he argues show the conditional fence would be compatible with other fences in his neighborhood: 7906 Berger Avenue, 7816 Berger Avenue, 7841 Veragua Drive, 7769 Veragua Drive, and 7805 Veragua Drive. None resembles Nolan's expansive fence structure, which reaches almost eight feet high; the overheight hedges at 7805 Veragua Drive are irrelevant because Hershey required Nolan to trim his hedges to three and one-half feet in height.

## DISPOSITION

The judgment is affirmed.  The City and Boppana are to recover their costs on appeal.

SEGAL, J.

We concur:

MARTINEZ, P. J.

STONE, J.